Please proceed, Counsel. Good morning. Brendan Cummings for Center for Biological Diversity and Pacific Environment. I'd like to reserve three minutes for rebuttal. All right. As with the case we just heard, this case also concerns the intersection of expanding oil production and a rapidly warming climate with consequent impacts to the polar day. The regulations we challenge suffer from two primary flaws, one structural and one analytical, that render the government's promulgation of these regulations violative of the Marine Mammal Protection Act and the National Environmental Policy Act. Could you keep your voice up? It's difficult to hear you. First, the agency issued overbroad regulations covering the full extent of oil industry operations both on and offshore in the Beaufort Sea, despite the MMPA's limitation that such regulations shall only cover a singular specified activity and in contravention of clear congressional direction that all such oil industry activities collectively cannot comprise a single specified activity. Second, the agency, in reaching its negligible impact conclusion under the MMPA and its no significant impact conclusion under NEPA, failed to consider an important aspect of the problem, namely whether the weakened physical condition of bears as a result of global warming makes them more susceptible to the impacts of take resulting from oil activities. The service's overbroad interpretation of specified activities is in conflict with the plain language of the MMPA, its legislative history, and the structure of statute. Under Chevron, the court must first consider whether Congress has directly spoken to the precise question at issue, and if so, that is the end of the matter. Here, looking first at the statute, the MMPA only authorizes Fish and Wildlife Service to allow the incidental taking of marine mammals by citizens engaged in, quote, a specified activity. This singular term is repeated throughout the statute. The legislative history is even more instructive. In a committee report promulgated when this provision of the MMPA was added, the report states that the term specified activity was to be, quote, narrowly identified. Specifically, this report states that, quote, it would not be appropriate for the secretary to specify an activity as broad and diverse as outer continental shelf oil and gas development. Rather, the particular elements of that activity should be separately specified, as, for example, seismic exploration or core drilling. In contrast to this very clear guidance, the challenge regulations cover not just offshore seismic exploration and core drilling, as mentioned in the report, but also all other oil industry activities in the Beaufort Sea region, including offshore as well as onshore activities. This overall statutory structure of the MMPA highlights why it's important that the regulations only cover a singular specified activity. The regulations require that the agency spell out at the regulation stage permissible measures of taking. Counsel, may I ask you a question? What case authority tells us how much weight we put on a house report? Because we know that legislation requires passage by both houses of Congress. So if we have a house report that says something, how much weight do we give to that in terms of ascertaining what the language is supposed to mean? One case, Garcia v. United States, from the Supreme Court, cited in our brief, says such reports, if they relate to language actually passed in the bill, are an authoritative source for finding. The only place in the legislative history where the term specified activity was discussed was in this report, and the language passed was the language discussed by the bill. The difficulty is there's no definition at all of specified activity. So we're kind of left with a void, which the agency may feel, and then, you know, some language that's, I mean, it has also some language that it should be substantially similar or, so it's hard to really say that that's the definitive intent of Congress. Right. Well, when the agency, shortly thereafter, after these regulations were passed in, or the statute was amended in 1981, in 1983, the agency promulgated regulations defining the term specified activity and said it's an activity which would have substantially similar results. But importantly, in that rulemaking in 1983, the service directly quoted from this legislative history and stated, for example, it would not be appropriate to have a single specified activity that covers all aspects of offshore oil drilling. So if the service really, I mean, following through on that thought, if the service really thought that it couldn't broaden, why would it make that statement and then promulgate a regulation that you feel totally disavowed that intent? I think the issue here is at the time of the statute and at the time of the service's initial implementing regulations, both the statute itself and the agency were relatively clear on what they intended to do, which is that specified activity, even if it was, you know, arguably subject to some interpretation, clearly was not so broad that it could cover all oil industry activities in a given region. The service acknowledged just as much at that point. Twenty-odd years later, as they're actually issuing such regulations and responding to requests to promulgate regulations, they take here an impermissible shortcut, which is lump all such industry activity into a singular set of regulations. And this violates the plain language of the statute  which are that at the statutory stage, permissible means of taking must be specified. But at this regulation stage, the agency must lay out means to afford the least practicable adverse impact on the species. In other words, what mitigation measures are required from a specific activity to minimize its effects on the polar bear? Those are entirely lacking here. When the agency groups all activities into one blanket regulation and then says, well, we'll deal with the specifics later, that undermines the statutory scheme contemplated by the regulation, which requires the regulations included and also be subject to notice and comment so that independent scientists, such as the Marine Mammal Commission, could comment on it and criticize or either criticize or recommend additional mitigation measures to afford that least practicable adverse effect. Moreover, the agency states that their construction is permissible because all activities covered by the regulations will have substantially similar effects. But throughout the regulatory preamble, they acknowledge that this is not really the case. At one point they state, quote, oil and gas activities could impact polar bears in various ways during both open water and ice-covered seasons. Impacts from noise disturbance, physical obstructions, human encounters, and effects on prey species are described below. And then the agency goes on to describe the myriad of ways all the activities contemplated by the regulations may affect the polar bear. But they do not attach specific mitigation measures, the measures to affect the least practical adverse effect on the polar bear as required by the statute at that stage. While the specified activity issue is a structural flaw with the regulations, I will now turn to the primary analytical flaw rendering the regulations arbitrary. That adverse impacts to the polar bear are already occurring from global warming is well established in the record and cited extensively in our brief. One such impact that is critically important appears repeatedly in the record, but is nowhere actually addressed by the service. This is the fact that polar bears in the region are showing up increasingly in poor condition resulting presumably from the shortened sea ice season as a result of global warming. How was that established that the polar bears have a poor resistance or diminished in their strength or activities? How was that established before the agency? In several respects. One, it was pointed out by the Marine Mammal Commission, which noted that leaner bears were being seen on the North Slope. Does leaner necessarily mean weaker? The Marine Mammal Commission said such. If female bears are leaner prior to entering maternity dens, it becomes more important to avoid or minimize disturbances that might result in them moving, abandoning dens, or using energy stores unnecessarily. That's at ER 206. Further, the commission also noted that, quote, if, for example, polar bears are in poor condition due to climate change and reduced availability of prey, they may become more vulnerable to the effects of contaminants and disturbance from oil and gas operations. That's at ER. So that's may. It's not approval. This is the commission saying this may be an impact and therefore it should be analyzed. Our claim doesn't go to the specific issue of how significant this impact is or what it may ultimately mean, but to the fact that the agency completely ignored it. But under the agency regulation, they have to analyze effects that are reasonably expected or reasonably likely. And if one says that there may be an impact, does that mean it's reasonably expected or reasonably likely? I believe so. Also, an important thing to note, on the Marine Mammal Commission's letter, on this precise point, handwritten notes from the service's top polar bear biologist writes true next to this. And then an internal email. And it may be. I mean, it's still not reasonably likely or reasonably expected because it may happen. Elsewhere in the record, the service also acknowledges that, well, two points. Our claim on negligible impact is that the agency's analysis is flawed because it failed to incorporate this into its analysis at all. This was a real issue pointed out by the Marine Mammal Commission, which is an independent agency created by Congress under the Marine Mammal Protection Act with the explicit purpose of giving advice to agencies on issues of scientific concern related to marine mammals. And the statute also requires federal agencies to explicitly respond to issues raised by the Marine Mammal Commission. The Marine Mammal Commission raises this. The service itself looks at it, acknowledges it's true. In an internal email, they also, from the service, raise the importance of this issue as well. And I'll read from that. It says, quote, Scott, referring to Scott Shleby, the polar bear biologist at the service. Scott also mentioned that the body size and weight of polar bear cubs are declining, the weight of adults is declining, and females are more frequently losing complete litters. He then asked, is this linked to climate change? Is this a consideration in the rule? The answer to those questions are yes, it is likely linked to climate change. But no, the service never considered this issue in the rule, and it was required to do so. And its failure to do so renders its negligible impact finding unsupportable. Did you want to save some time for rebuttal? Yes. All right, thank you. May it please the Court, I am David Shilton. I am representing the U.S. Fish and Wildlife Service. I plan to take about 15 minutes and then give about five minutes to Mr. Lepo, who is representing. I only have 15. I'm sorry, I'll take about 10 or 12 then and allow Mr. Lepo the rest. I would like to first. Could you give him 15 minutes? It should have been 20. I'm sorry. That's all right. My mistake. Thank you. I'd like to first discuss the standing issue raised by the Supreme Court's recent decision in the Summers case and then discuss whether the challenged five-year incidental take rule was consistent with the statute, whether it adequately accounted for the effects of global warming, and then finally whether an environmental assessment was all right here rather than an environmental impact statement. But first I just want to clarify what this regulation does and does not do because that's important for each of the arguments. The challenge regulation sets out the parameters for authorizing nonlethal incidental takes of walrus and polar bears in the Beaufort Sea region for the years 2006 through 2011, and it makes the finding that the total of the expected takes, nonlethal takes that is, over this period, will have a negligible impact on those species or stocks. That finding is based in part on the record from earlier versions of this same regulation, which has essentially been in place since 1993, and the monitoring which has been required under those earlier versions, which has shown that these occasional nonlethal takes, consisting primarily of efforts to haze polar bears away from areas where they might interact with humans, has had only temporary and insignificant effects on these animals. The regulations themselves do not authorize any incidental takes. Persons seeking authorization to engage in a nonlethal take have to apply for a letter of authorization for their particular proposed activity, and it's the granting of a letter of authorization where the service determines precisely what mitigation and monitoring requirements will apply to the particular proposed activity. Now, on the issue of standing, I think the Supreme Court's recent decision in Summers makes clear that an organization that wants to challenge a regulation that doesn't directly regulate the conduct of that organization has to identify some application of the regulation that threatens imminent and concrete harm to the interests of its members. And the Court in Summers considered a challenge very similar to the one here, where the Forest Service had issued regulations governing small timber sales, which the plaintiffs alleged were inconsistent with the statute concerning the procedures for those sales. And the Supreme Court found that the organizations didn't have standing to challenge the regulations in the absence of a showing of some particular application of the regulations that threatened harm to the organization's members that was imminent and concrete. Well, counsel, here in this case, as opposed to in Summers, the appellants allege their current and future harm from these regulations as opposed to past harm. So that's different from Summers. And they also allege, which is all they have to do in the complaint they have standing, is that the regulations will impede their ability to enjoy polar bears in the area. So why doesn't that confer standing under the very – it doesn't take much to allege standing in this area of the law. Well, I think, actually, in Summers, the allegations were quite similar in that the plaintiffs there were alleging that currently and in the future they plan to use national forests, and if these timber sales were carried on without these procedures, they would be injured. And the Supreme Court said that's not enough. You've got to point to a particular application of the regulations that interferes with some actual plan of yours to visit a particular national forest. So I think that, you know, Summers – They do say they plan to attend this particular locale, the Beaufort Sea area, rather than just globally the regulations that apply globally. Well, the Beaufort Sea area is, of course, very large, and I think what they've failed to do is to point to a particular authorization of one of these takes that is going to affect their enjoyment or affect the bears or walrus. And that's important because, especially here, where the question is whether the service has adequately specified the activity, you don't really know that until the authorization occurs with a letter of authorization and the actual mitigation measures are applied and monitoring is applied. So there is a real purpose to waiting for that actual application of the regulation. It's not just an abstract threshold matter. So we think that Summers does apply here. But let me get to the merits issue, which I know the Court is concerned about. The statute talks about requests for incidental take authorization from citizens who engage in a, quote, specified activity other than commercial fishing within a specified geographic region, end quote. How the agency is supposed to determine whether a request covers too broad of an activity or too broad of a geographic area is not spelled out in the words of the statute. And so the Fish and Wildlife Service promulgated, as counsel mentioned, in 1981, general regulation, I'm sorry, in 1983, general regulations which instruct that, quote, the specified activity and specified geographic region should be identified so that the anticipated effects on marine mammals will be substantially similar, end quote. So in other words, having substantially similar effects that are anticipated was the criterion that the agency developed to identify the appropriate scope of specified activity. Counsel, what's your response to opposing counsel's observation that in the House report and in the initial regulations there was a different orientation regarding what the range was for specified activity? It was very much more narrow. Well, the original regulations in 1983, while it's correct, as counsel stated, that in the preamble it does quote from the House report, those regulations did not evidently take that report to require that it use a criterion other than substantially similar effect. So I think the regulations in 1983 are consistent with the approach that the service has taken since that time. And I think that, you know, the 1981 report, the thrust of that House report, is that incidental take authorization should be narrowly identified so that the anticipated effects will be substantially similar. So the examples that are given specifically say that, you know, each part of the oiling process should be analyzed separately. The dredging and all of exploration, all of that should be considered as separate. Well, I think they are just that, that they are examples. And they are given to illustrate the committee's concern that these activities be specified in a way that the effects on the animals will be substantially similar. But I do think it's a substantially similar criterion, which is at the heart of what the House report was saying. And given that the statute itself doesn't specify a test, and given that it also gives explicit authority to the agency to promulgate regulations, I think it is fair to say that the agency did the right thing by saying that the essence of what the House report was getting at was this substantially similar effects on animals, and that the examples given there were just examples and not substantive limitations. And I think that made a lot of sense because the whole point here is to be protective of the animals. And where you have a species like polar bear that range widely, they may cover some area in the sea and then on land, and encounter a number of different oil and gas activities, that to split that up in a way that splits exploratory drilling from development drilling really doesn't make sense from the point of view of protecting the animals. And what the Fish and Wildlife Service wanted to make sure that it was doing here was being able to take into account all of the effects of oil and gas development in this area in deciding whether or not these non-lethal incidental takes were going to have only a negligible effect on the animals. I suppose if the service, if the government had decided to segment them out, then we'd be facing an argument that the cumulative effects were not considered. I think you would. But I think this is the ironic thing about the case in that typically the charge made against the government is that it takes too narrow a focus and doesn't look at all of the effects on the animals. And so here the service came up with a regulation that does allow it to take into account all of the effects of oil and gas development. So it makes sure that the polar bear and walrus are not going to be impacted by the combination of all of these efforts. And these regulations have worked very well since 1993 to prevent impacts to the polar bear. There's never been any evidence that these non-lethal takes have had any kind of adverse effect on a polar bear or walrus. And that brings me to this question of whether the Fish and Wildlife Service this time looked at the effects of climate change adequately, and particularly the possibility that bears might be weakened. They rely on the Marine Mammal Commission's statements in the record to say that this whole issue was adequately raised. But what's interesting about the Marine Mammal Commission comments is their conclusion, which is, and I quote, this is from the excerpts of record at page 204, the commission agrees with the service that incidental takes due to noise or physical obstructions can be mitigated and are likely to have no more than negligible impacts on the population. So the bottom line is this approach, the regulations, has worked. It's been successful. And so I don't think it would be appropriate to take examples in a House report and say that those impose a substantive limitation that preclude this very reasonable approach to protecting the polar bear and walrus. Now, on the global warming issue, I think it's important to look at the timing here. These regulations were promulgated in August of 2006. The polar bear was listed as threatened in 2008 by the service, and the plaintiffs have used a lot of record references to that proceeding. But I think we have to look at what was before the agency in 2006. And there, the concern about global warming and polar bears was certainly present, and the environmental assessment devotes a lot of attention to global warming, the effects on the ice. Now, this idea that you need to look at the particular condition of the polar bears, that was just barely raised, if raised at all, in the comments of the Marine Mammal Commission. But the service did consider that issue, and I'm referring to excerpts of record page 116 to 117. And there, the service, that's in the environmental assessment, it concludes that it was not likely that this would be a significant factor in the 2006 to 2011 period. This is a concern, you know, for the next 45 years. This is obviously something they're going to have to keep an eye on. But it was not a concern that undercut the conclusion of no significant impact in the regulatory period. And so there's just no credible evidence in the record casting doubt on the agency's conclusion that mitigation measures, which had proven adequate over the 1993 to 2006 period, would suddenly not be adequate to prevent a non-negligible harm to the polar bears. And these are mitigation measures such as requiring a buffer area of one mile around any polar bear den that's known, and requiring companies to do a search with radar to make sure there's not any unknown dens in the area. So the service has devoted a lot of attention to protecting the bears and making sure that these non-lethal incidental takes don't affect the bears. Now, Mr. Shilton, when does that come into effect? We're talking here, I think, about the sale of leases. Step two in the four-step process of developing a plan, selling the leases, the exploration, I guess, discovery of presence of oil, and then actual production. Those are the four levels. Now, I think once the leases are sold, and then you have the companies coming back and saying, okay, now we want to explore. We want a letter of authorization to let us do this. And then fish and wildlife will say, okay, to do that, these are the restrictions that you will be bound by. And they impose restrictions on the letters of authorization. Yes. Now, the lease sales that were discussed in the earlier case, the lease sales themselves don't have any impact. It's a paper transaction. So there's no need to get a letter of authorization for the lease sale itself. But the next activity that might occur might be seismic testing. And for that, you need to get a letter of authorization pursuant to these regulations because it's possible that the seismic testing might cause a taking by harassment of a polar bear or a walrus. So that's when you get your authorization and get your conditions. And then if you want to do exploratory drilling, that requires an exploration plan to be approved by the Minerals Management Service, where there would be a whole other, neater review there. But also you would need a letter of authorization to take care of your obligations under the Marine Mammal Protection Act. So that's correct. What we're talking about here is kind of a stage beyond what was discussed earlier about the lease sales. I see. I've taken my time unless there are other questions. It appears not. Thank you. Good morning, Your Honors. My name is Jeff Leppo. I'm with the law firm Stull Reeves, and I represent the Apelli and Aminor Alaska Oil and Gas Association. I'm going to close out Apelli's argument by focusing the Court's attention on five key unchallenged findings in the administrative record. The Center has presented its case, its arguments, here in an abstract context, divorced from any specific application. And really they've divorced as much as possible this case from the 15-year record of success in the implementation of six and now the seventh regulation of exactly this kind. But this is an APA record review case, as you know, and the Fish and Wildlife Service's decisions were based upon the best available data and information and predictive judgments of the Service's polar bear experts. Based on a decade and a half of experience, monitoring, reporting, study, analysis, the record shows and the Service concluded these things. One, the level of interaction between the oil and gas industry and polar bears or Pacific walrus has been and is expected to remain, quote, minimal, end quote. That's well documented. There's no conflicting data in the record. It's unchallenged in the record. Second, since 1993 there have only been nine observations of walrus in the Beaufort Sea. They're seldom even in the area. There's no indication, literally no indication, that a single walrus has been injured as a result of an interaction with the oil and gas industry in Alaska. Third, the vast majority of polar bear sightings are by a monitor spotting a bear transiting through or resting in an area, resulting in no effect. In a minority of instances, polar bear sightings involve deterrence of the bears with, quote, no injury, end quote. There is no indication, again, literally no indication in the record, that these encounters, which temporarily alter behavior and movement, so they move a bear over here instead of over there where people are, no indication that they've ever had an adverse effect on survival or recruitment of the affected polar bear population. Mr. Lepo, I think when they come to rebut, they're going to say what they said initially, that the studies don't take into consideration the weakened conditions of the polar bears because of global warming, so that what happened in the past, they will argue, I expect, is not a measure of what might happen in the future because we're looking at different bears. And here's the response in the record to that. The service considered global warming, as Mr. Schulten said. It considered it on a broader scale than just the reductions in their fitness. There are a whole variety of impacts from climate change to polar bears. Their habitat is going to go away if climate change realizes the potential. And so there are many components to this, and the service considered that global climate change was going to be a bad thing for polar bears. I mean, it did, and it says that in here. But it also looked at these regulations and the impacts, and it concluded that they're all temporary and they don't accumulate, and that the effect of these regulations are ameliorative. The word beneficial appears in the decision and in the EA.  And so what they concluded was rather than the effect of these regulations and the takes compounding cumulative being worse with climate change, they're ameliorative. With these regulations, the consequences are less than without these regulations. And so that is the response. Let me mention two more key findings in my 14 seconds. Fourth, the potential for impacts and the character of the impacts are substantially similar. And this is the point, going back to interpretation here of the regulation. They have 15 years of experience, and based on that, the service, which is entitled to substantial deference, concluded that they are substantially similar in ways. They all result in deterrence by deflection. They all present obstruction by structures which deflect. They all create noise, which, again, deflect bears, and there's the risk of an oil spill. And let me say that while there is a risk of an oil spill, there's never been a polar bear and there's never been a walrus oiled on the North Slope. And so while the consequences of an oil spill are not good, the potential, the probability of that occurring is so minimal as to be discountable, and that's how you end up with an oil spill. All right. Please wrap up, Mr. Leffel. You have exceeded your time. Thank you, Your Honor. Thank you. Rebuttal. The first issue I'll address is the standing issue. This issue was not briefed at the district court or before this court and only arrived after the summary session. But you know standing can be raised at any time. Yes, absolutely. But this case is very different from Summers. Summers involved nationwide regulations governing the entirety of the Forest Service's land holdings. And in that case, plaintiffs were unable to demonstrate that the regulations would impact their particular recreational interests of their members in any concrete way in any particular place. Unlike the nationwide regulations of Summers, these regulations can lawfully only be applied to a specified geographic region, to specified activities, and specific to the polar bear in Wallace. So moreover, unlike the regulations in Summers, here these regulations have been, in fact, applied. At the time of the complaint, at least 17 letters of authorizations had already been issued. So we had the harm that the plaintiffs alleged was already occurring. So this is very different from Summers. Moreover, it is well established in the Ninth Circuit and by the Supreme Court that interest in a species, interest in observing an animal such as the polar bear, is of sufficient interest for standing. And that's been met here regardless of whether, as long as the activity that you complain of affects and may impair your ability to continue to observe that species, that's sufficient for standing. And that was alleged here. Turning to the merits, the government's standing argument, in some ways undercuts their merits argument on specified activities. They argue that we can't possibly be hurt until and unless it's demonstrated in some specific way at the LOA stage. But the regulations require that the activities, the level of take, acceptable measures of take, and mitigation measures occur at the regulation stage. So for the regulations to be valid, all that information would have to be known, therefore also meeting the standing requirements. One important issue that comes up, Mr. Aleppo framed these regulations as beneficial to the polar bear. But that framing ignores the reality of the law and a finding by this court in Ramsey v. Cantor that such a framing of the issue is untenable. They frame the issue as the choices between unregulated industry activities, which would impact bears, or regulations that attach mitigations to that activity. And, of course, regulated activity is more, it's better that the activity be regulated than it be unregulated. But that's not the appropriate analysis. Counsel, you don't take issue with the record, which shows that there has not been one take of a walrus during the period these regulations have been in effect, do you? No, and we're not challenging the negligible impact finding as for walrus, or the significant finding for walrus. For walrus, we're attacking, walrus is implicated in the overly broad specified activities. Okay, so you're saying for the polar bear, there has been, what's the history in terms of the polar bear? There hasn't been any, there have been no takes of polar bears, have there, except for maybe shooing them away, and shooing may not be the right word for a bear, but, you know, deterring them from coming around the individuals who are engaged in the oil industry. Has there been any? There's been significant evidence of take as defined by the statute. Whether that take is having an impact on the species, an adverse impact on the species, is the question. Two points come up there. One, the Marine Mammal Commission, again, pointed out that while the service assumes that there's only a negligible impact, the agency actually has no way of knowing what that impact is, and states, without such a program, this is a monitoring program to determine what impacts are occurring to the polar bear population, there is no way to know whether or not industry activities by themselves or in combination with other factors are having more than a negligible impact on the population. Also, if that's the case, if there is no impact, then how do you say, I mean, what's your evidence that the regulations are having an impact? The statute requires the agency to make an affirmative finding that these regulations will have no more than a negligible impact. The Marine Mammal Commission and the service itself acknowledge that they can't actually prove that they're not having a negligible impact. They have no way of measuring that. They assume that's the case based on the past regulations. We argue that that assumption is no longer valid. Even if it were true, it's no longer valid, given the changing conditions of global warming. In terms of actual harms, again, the record shows various types of activities that can and do put polar bears at risk. For example, in the regulatory preamble, the service states, quote, information exists indicating that polar bears within the geographic area of these regulations may have abandoned dens in the past due to exposure to human disturbance. That's at ER 29. The service later goes on in the Federal Register document talking about how noise and vibrations produced by oil and gas activities can disturb bear, and quote, as stated earlier, disturbances to denning females either on land or on ice are of particular concern. So there is a very real risk of harm to bears from these activities. And that risk is heightened by the fact that the bears that are being disturbed are now more vulnerable. So a very healthy bear may, in fact, not suffer much consequence from being hazed away from a site, but polar bears that are arriving in increasing numbers in poorer condition, hungry, spending more time on land because there's less ice, those bears are more vulnerable. And none of the documents, even though this issue was raised in the record, nowhere in the document does that impact actually count. All right, thank you, counsel. Thank you to both counsel. The case that's argued is submitted for decision by the court. That completes our calendar for today. We will be in recess until 9 o'clock a.m. tomorrow morning. All rise. This court for this session stands adjourned. Thank you. Yeah. There's four of us now. Okay. We'll probably see you tomorrow. We're going to see you. Thank you.
judges: Farris, Thompson, Rawlinson